You will hear argument first this morning in Case 23-715, Advocate Christ Medical Center v. Becerra. Ms. Sherry? Mr. Chief Justice, and may it please the Court, the same words in the same sentence should have the same meaning. Today we are talking about the words entitled to benefits in the DISH adjustment. Just two terms ago in Empire Health, this Court looked at the words entitled to benefits under Medicare Part A and said that it means qualifying for the Medicare Part A program. Entitled to SSI benefits in the same sentence should mean the same thing, qualifying for the SSI program. A person qualifies for the SSI program when she applies and is determined eligible. And that eligibility lasts until it is terminated. The government disagrees because it says that there is no such thing as an SSI program and the only SSI benefit is a monthly cash payment. But Congress created what it called a national program and it created a program of income insurance. This is a program where a person who is low income enough to qualify in the first place is promised a minimum guaranteed income for a calendar year. And in the months where that income is not needed, the cash payment is suspended. Nothing is terminated and other benefits remain available. In the end, this is about DISH and DISH is about ensuring that hospitals are reimbursed for low income patients that are less healthy and that are costlier to treat. And health does not change overnight. The government's interpretation simply does not count that low income population. It does not count the low income Medicaid patient coming out of a nursing home. It does not count the low income patient waiting for her first check. And the list of those it does not count goes on and on. A DISH proxy that does not measure the low income population is no proxy at all. I welcome the Court's question. Are there other benefits other than cash under Title 16? There are. There are non-cash benefits including Medicaid continuation, and you can find that in 1382H subsection B. And there's also vocational rehabilitation, which you can find in Title 16 under 1382D. The government's response to that I think is twofold. It's to say that non-cash is not income, but probably more so to say that those aren't benefits under Title 16. But they're both housed in Title 16. They're both triggered by being program eligible under Title 16. And especially when it comes to Medicaid continuation, it's referred to as a benefit under 1382H, which is in Title 16. Could you clarify for me the Medicaid regulation that the government relies on? It has something to do with if someone's on Medicaid, if they receive more than $30 a month in income, they're no longer eligible for SSI? Yes. So this comes out of the SSI statute, and it makes sense when you're thinking of SSI. So the reasoning behind it is that while you're in a facility where Medicaid is paying for your daily needs, you don't need the full payment. Instead, you'll get this $30 comfort payment, but only if your income is actually under $30. And for most people, because you get a Social Security check, that's not going to be the case. And I think that's one of the most significant problems with the government's approach, is it doesn't count any of those individuals as low income for purposes of the Medicare fraction. And it's really significant because we have two different fractions here, right? One measures low income based on SSI. The other one measures it based on Medicaid eligibility. And so these are people that are by definition Medicaid eligible, and so low income when you think about the Medicaid fraction. Yet because of the way they do the calculation here, they're actually not counted in either fraction. I am a little concerned about the Medicaid situation because, as I understand it, when people are placed in nursing homes, they assign all of their income to the nursing home. And Medicaid then picks up whatever the difference is between that income and whatever the authorized charge is. So by the government counting the SSI as income to the patient, they're ignoring that the patient is only seeing about $30 a month. Yeah, and I think even less than that. I mean, I think the real problem with the government's approach is that person, in the terms of the regulations, is thought of to be eligible for SSI but not payable. And those individuals just aren't counted at all for DISH purposes. And so I think there was an assumption in Empire Health that low income individuals would be in one fraction or the other, one box or the other. But this takes these individuals who are indisputably low income in their hospital month, and it doesn't count them at all. And I think this is one of the places where the government's arguments confuse the purposes of the SSI statute and the purposes of DISH. And so, you know, maybe there's a good reason why they don't get a check. Maybe there's not, as Your Honor pointed out. But whatever the answer to that question is, it's specific to SSI. For DISH, there's absolutely no reason why they shouldn't be counted as low income for purposes of figuring out the hospital's reimbursement. Sherry, am I correct? I just want to clarify that you're not challenging any of the specific codes because people fall out for different reasons, you know, wrong address and all of that, some of the S codes. Yes. But you're not challenging any of those. And the D.C. Circuit held that those challenges were waived. So I think what was going on in the D.C. Circuit was really challenges to what kind of happens behind the curtains as far as the counting goes. The challenge that we have is just to what the interpretation of the language should be. And under our interpretation, all of those codes would be counted because our view of it is that it's about program eligibility and someone is- Let's just assume if you lost, it's still possible for you in other litigation, even if not on remand, if it's waived, to challenge particular codes. I think it depends. I mean, I think the government's view, if the government's interpretation prevails here, I think all of those codes would be out because the government is defending what- I think defending, although maybe ask them, but I think defending what CMS is doing, which is only counting three codes, and that's at pages 47 and 48 of their brief. And so if their interpretation prevails, they will continue to just count the three codes. And you can imagine litigation about whether they're doing that correctly, and there has been litigation with respect to that. But as far as our differing interpretation goes, I think we're at two different extremes. Because it seems to me like if you're eligible for a monthly payment because your income was low enough but you didn't get the check because, for all of the various administrative reasons why you might not get it, I could imagine you satisfying the statutory definition, even under the government's approach, but yet still be entitled to a check that somehow the codes don't account for. So I'm curious as to what the government's view is. I can say that CMS is not counting those individuals, right, because they're only counting the three codes. And I think they're basing it-we call it an actual receipt rule. Maybe it's an actually sent rule. But they're only counting those for which a payment has been sent by the time they do the matching process, so 15 months after. And anyone who doesn't have one of those three codes at the time, which would include all the individuals you're talking about, just wouldn't be counted. But I don't think you can just draw the line at those individuals because there's a second category, including the nursing home patients, who are still eligible. They're just not payment eligible in a particular month. They're not due a payment in that month. And the government, I think, admits that all of those individuals fall out under their approach, too. It includes those in their first month of eligibility. So they just went through the application process and were found to be low income, yet they're not entitled to a check their very first month. Those individuals would not be counted. Also, in the other category, there's individuals who are in prison, who also aren't counted because they're not due a check. That might make a lot of sense when it comes to SSI. It doesn't make any sense when it comes to DSH because the individuals who are low income, who are in prison, certainly aren't getting any healthier when they're transferred to a hospital. So as a textual matter, you seem to be distinguishing program eligibility, as you say, and eligibility for payment. And I'm just wondering whether that's pretty common. I mean, I sort of conceive of other benefits programs in the federal scheme in a similar way. I sort of thought that's what we were saying in Empire, that you could have Medicare where you have criteria for program eligibility, but just because you don't get the benefit doesn't mean that you don't qualify for the DSH fraction. Is that sort of how your argument works? It is, right? There's a difference between whether you have a right to payment at a particular time or for a particular service and whether you are in the program, whether you are entitled to benefits under the program. And we're making the same distinction here that the court made in Empire Health in that respect. And I think you could look, I mean, in terms of the actual textual language, you can look at a few provisions. The most notable one in the SSI statute we point out in our brief, it's on pages 34A and 35A of the statutory addendum, and it's this financial records provision. And it basically says you authorize us to access your financial records, and that authorization lasts until cessation of your eligibility for benefits under Title 16. And the government agrees that that has to mean program eligibility, because otherwise it would be a very nonsensical system to have to get reauthorization every single month. And the regulations confirm that because they say that the authorization is valid until there has been a terminating event. And so your argument, just in terms of the purposes, because you brought that up before, is that you view DSH as trying to get at those people. Trying to get at the larger group of individuals. The larger group of program eligibility, because it doesn't, in your view, make any sense that whether or not a person gets a payment has some sort of relationship to the DSH fraction. That's exactly right. And if you look actually at the legislative history for DSH in the Senate report and in the conference report where they're talking about the Senate bill, the language is the same there as it is now when it comes to SSI at least. And for that language, they describe it as wanting to count those who are enrolled in the SSI program. So both acknowledging that there is a program and focusing on the class of enrollees. And I think that is most consistent with the DSH purpose, but I think it's also most consistent with the text of DSH, which talks about entitled to benefits plural and also excludes one particular benefit, which is state supplementation. So it's a broad definition, but it's also a nuanced one that would include everything else that is not excluded, which includes the cash benefits, but also includes things like Medicaid continuation and also vocational rehabilitation. Both are within Title 16. Can I step back a minute, Ms. Sherry, and just ask you about the nature of your argument? Because you start both in the briefs and then again this morning, you know, by saying entitled to benefits can't mean the same thing when it's used twice in one, can't mean different things when it's used twice in one sentence. But, of course, this is entitled to benefits under Medicare and entitled to benefits under SSI. And Empire was all about what entitled to benefits under the Medicare program meant. I mean, it did a sort of microanalysis of the Medicare statute and its structure and its purposes and its text. So if we thought that the SSI program was completely different, if we thought that, and I know your argument is that it's not, but if we thought that, this argument about the language can't mean different things in the same sentence would completely go away, isn't that correct? Partially. So I want to clarify. We think you have to start with the statute and we think you have to start with Empire, but that's not to say you shouldn't look to the SSI statute. You need to do that to determine whether someone qualifies for a program. Now, as far as what entitled means, I do think there would still be an oddity in terms of saying entitled does not mean right to payment, it means eligible in one part, then entitled means right to payment, it doesn't mean eligible, and then you get down to eligible and you say it doesn't mean right to payment, it means the same as the first entitled but not the second entitled. So I do think that would be a complicated thing to do. I guess the question, though, is what it means to be entitled to benefits under either program. And if you thought what it meant is very different, that entitled to benefits under Medicare was very different from entitled to benefits under SSI, or similarly that eligibility for benefits under Medicare was very different from eligibility for benefits under SSI, then that's the way you would read the statute, correct? I think that's true if you focus on benefits. And the only thing I'm pushing back on, I would agree with you. I mean, if you took entitled to and you ran it through the SSI statute and it became clear it's a term of art, it always means right to payment, you would probably overcome the presumption and read it back in. But entitled to is not a term of art in the SSI statute. It's rarely used. And so that doesn't work. Let me just look at its most starkest form. You know, suppose, and I know that you vigorously resist this, and I'm not suggesting, let's just assume for a second that SSI was not an insurance program of the kind that Medicare is, nor is it a program that gives you a panoply of benefits, but that instead it was simply a cash subsidy that is given on a month-to-month basis. Let's just say that. And I know you have a thousand objections to that. But, I mean, then you would say, well, you know, then the government has to be right, notwithstanding that it's entitled to entitled to in the statute. Right. That would be a different case because you would say when you qualify for the SSI benefits, it is limited just to that monthly right to payment. I mean, it was just people off the street. Right. There's no program. There's no application process. Just every month you call up, say, I checked these three boxes. Give me a check. The next month you call up again. And there's no application process. There's no program. There's no other benefits. Yes, it would be a completely different case. So it's just that, you know, just to put it in its starkest form, in the end, this is a question about the nature of SSI. Right. If you are right, you win. If the government is right, the government wins. In the sense of, is SSI a program that gives you lots of different kinds of benefits once you qualify for it? One may go away, but you retain the others. Or is SSI just a monthly check that you get in the mail? I think that is a key part of the analysis. I would hesitate to say it's everything because I think you still have to come back to the text of DISH, and I think you still have to come back to the purpose of DISH. Go ahead. I mean, your lead argument is, and, you know, it's catchy when you read it, that the phrase entitled to benefits can't mean two things. But following up on what Justice Kagan was asking, I don't see how the government's argument does that at all. What you're saying seems to me, when you think about it, terribly superficial. It's the nature of the entitlement. So entitled to benefits can mean exactly the same thing in these two contexts, but, you know, it's the nature of the entitlement. So if the entitlement is different under Medicare and under SSI, then that argument falls apart. So I think there's two ways to look at the government's argument. One is, is it interpreting entitled to mean two different things? I think during the Empire Health argument, that was a concern, it was a problem, one with the government's interpretation there. But I think even if you don't read it that way and you read it as focusing just on the qualifications for the program and SSI being different, it doesn't hold up on that ground either. So you can take, you know, everything about the same word meaning the same thing and put it to the side and just focus on the SSI statute, and it doesn't look different in any way that matters. Okay. So we get to those arguments. Now, another argument that you have is that this is like Empire Health, but isn't Medicare different from SSI in at least two very important respects that Empire Health emphasized? SSI payments are not automatic and they're not enduring. Isn't that true? And that is not true of Medicare. There are differences, but the differences I think actually, as far as it not being automatic, point in our direction. So, yes, you need to apply to be entitled to SSI benefits, but I think that helps our interpretations because basically there are application bookends on either side that show that there is a program that you are eligible for. And so the difference here is Medicare Part A, you're automatically entitled. Here you have to apply. But once you apply, then we're in the same world. Then you are entitled to SSI benefits, and you're entitled to them until you've been terminated from the program. The statute distinguishes between suspensions and terminations, and the regulations do the same thing. Subpart M of the regulations separate out suspensions from terminations, and you can't be suspended unless there's something to be suspended from. And so I think the application distinction works in our favor. Keep going, sorry. Oh, no. Well, I think the question from both Justice Kagan and Justice Alito, at least as I understand them, boils down to, is SSI similar in relevant respects to Medicare for purposes of interpreting this statutory provision? And I think the government emphasizes two things, maybe more. One, that Medicare is an insurance program, and SSI, they say, is not. And two, at least the big picture that I understand, people drop in and out of SSI more readily than they do on Medicare. And I think how we analyze those two questions determines how similar SSI is to Medicare, at least as I understand it. So I want you to focus on the insurance description and the falling in and out as distinct from Medicare. Sure. So on the insurance distinction, this is, you know, it's not health insurance, obviously, but it's income insurance. It's not just this monthly payment to strangers on the street. What do you mean by the word? I'm going to ask the government this, too. What do you mean by the word insurance? Almost assurance. So the concept here is that you're guaranteed a minimum income for the calendar year once you're a part of the program, once you've applied and been accepted. I think of it as if, you know, you have a college graduate whose parents say, congratulations, go get yourself an apartment, and we will send you a rent check for every month in which you don't have enough money to cover rent. And so if you have a job and you're making money and you can cover it, you're on your own. But if you come up short, we'll cover the difference. And we'll do that until you've been able to string together 12 months where you've been able to pay for your own rent, at which point, deals off, you're on your own. That's really what the SSI program is. So it's not just the cash payment in a given month or making up the difference. It's knowing that you're guaranteed this minimum income for as long as you're in the program. And then the dropping out, I think one of the government's suggestions is you can drop out of SSI more readily, and somehow that, for purposes of the questions Justice Kagan and Justice Alito were asking, makes SSI relevantly different. Right, so I don't think that's a distinction either. I'm not sure even if it were it would matter. But I don't think it's a distinction because there's two kinds of eligibility, and it depends what the government is talking about. There's program eligibility. And individuals do not drop out of the program all that often. I think the statistics the government give, and it's in the Joint Appendix from the Court of Appeals, it's at page 147, is that about 350,000 people, I think it's in 2009, were terminated for excess income. First of all, that's about 5% of the population. But if you look more closely at those who are likely to be Medicare eligible, so over the age of 65, and that's at the bottom of that page, it's roughly about 35,000 people total who drop out. The reality is most stay in this program for a long time, and so I think it's actually quite stable. Do people drop out of Medicare? I think people drop out when they're no longer disabled would be the primary example.  And so I think, you know, once you get down to it, it's pretty comparable. And then if you look at payment eligibility in terms of like the month-to-month payments, in Empire Health it was recognized that people might not get payment for a particular service because they've exceeded the 90 days, for example, or because a primary priority is paying. So there's some lack of stability when it comes to payment for Medicare Part A. And then you translate that over to SSI, and they, again, point to statistics, and this is the prior page, 146 of the Joint Appendix in the Court of Appeals, and that number is higher. It's about, I think, 650,000 individuals in 2009 who were suspended for excess income. But, again, if you focus on the over 65 number, it's about 71,000 people. And so even when it comes to payment eligibility, it's not nearly as variable as they suggest it is. Ms. Sherry, if we might take a hypothetical. Let's say I have a 70-year-old person who is deemed eligible for SSI because of his income, but then in certain months in the year makes over a million dollars a month. I know that's unlikely, but let's just suppose it. Is he entitled to benefits for the full year? I would say he probably doesn't meet the resource. He's not eligible for those months. Well, he's probably not eligible to begin with, but even if I assume he's spending the million dollars. Let's assume at the beginning of the year, for some months, he is indeed entitled to and eligible for benefits, and he gets them, but then in certain months he makes well in excess of the income threshold. Is he entitled to benefits under your view for the full year? He is until he's terminated from the program, and I think there's one good explanation for it and one reason. He's entitled to benefits even though he's not eligible for them. He's not eligible for the cash payment, and let's just assume he's also not eligible for Medicaid continuation and vocational rehab. He's still entitled to benefits, and that's because of the concept of conditional entitlement that was at issue in Empire Health as well. Entitlement coexists with limitations on payment. That's what the court said in Empire Health, and the statutory language the court relied on for that in Medicare Part A is also present in SSI, and so if you look at the SSI Statute 1381A, it talks about being eligible for payment, or I think it says paid, subject to the provisions of the chapter and then the comparable language in Medicare Part A. I mean, it seems to me Medicare is quite different from this in that respect. I mean, there were lots of arguments in Empire Health, but one of the main ones was even if you had reached the cap on hospital care, there were other kinds of care that you could access under Medicare. So you would reach the cap in terms of your hospital stay, but you could get outpatient treatment for some other condition. So the Medicare was not going away. But here the only thing that there is, which really is the cash payment, is going away in the months in which the person receives more than the threshold income. Isn't that right? There's nothing left. Again, assuming this person is not eligible for Medicaid continuation and vocational rehab, there's the guarantee. But I think this is where you have to take a step back and look at the purposes of DSH, because I think you can come up with this hypothetical example, but I do think it pales in comparison to the real-world categories of low-income individuals who are left out if you're looking at the two on a scale. And even with the $1 million hypothetical, that person, you know, is not looking at low income for low income's sake. It's looking at it because it's trying to identify a class of individuals who are less healthy and more costly for the hospital. And so if that person was low income enough to qualify in the first place, just because he's getting $1 million in one month is not going to change his health overnight in a way that's going to matter to the hospital's bottom line. Thank you, Counsel. Justice Thomas and Justice Alito. I assume that the vocational rehabilitation benefit that you think is a part of Title 16 and the 1382H that you think is a part of it. How about if we disagree that the vocational rehab is a program run separately from Title 16? So what are you left with? Are you left only with the argument that this is a, and it's a powerful argument, I'm not denigrating it, that this is an insurance program for a year that you're guaranteed payment at least if your income is low for that year. So if you don't get it one month, you're still going to be getting it the second, third, or fourth. That sounds like a program to me, too. But part of your argument that some of my colleagues are focused on is the fact that there are no other benefits for that month. Right. So if you disagree on the non-cash benefits, then, yes, we are arguing that it is a program, it's an income insurance program, and you don't need the non-cash benefits to agree with us on that and rule for us on that. I think it's an additional, it's icing, so to speak. I think you do have to, though, if you agree that there's non-cash benefits, there's no way to rule for the government because their position rests on it only being about cash. So I don't think we need the non-cash benefits to win. So why don't you spend a moment on the government's counterarguments as to why those two provisions are not part, they're not additional benefits. Sure. So let me start with vocational rehabilitation just because I touched a little bit on Medicaid continuation already. It is a benefit provided under, you know, it's housed in Title 16. You can look at 1382D, which is in Title 16. It is 1615 of the Social Security Act, so very much in Title 16. Secondly, it is funded by Title 16. The appropriations under 1381 is where the funding comes from, and you qualify it if you are a Title 16 disability beneficiary. And so the person who is in the SSI program is getting reimbursement or the state is getting reimbursement for that benefit because they are covered by Title 16. So in every which way, it's a Title 16 benefit. The government's counterargument, putting the non-cash issue to the side, is that it shouldn't qualify as under Title 16 essentially because it's also under Title 11 and it's also under states. That doesn't hold up because it reads as exclusively under, and yet in DSH itself, they excluded state supplementation benefits, which are not exclusively under Title 16. They're provided by states, yet Congress understood them to be benefits under Title 16 such that they needed to be excluded. And so there's a real inconsistency between those two positions. On Medicaid continuation, almost all of the same arguments. You can find it in 1382H. It is 1619B, and it is also triggered by eligibility in the SSI program. But on that one, too, you can look throughout Title 16 and see it referred to as a benefit under 1382H. 1383J is one place to look. I believe it's also in subsection K and subsection P. Thank you. Justice Kagan? Justice Gorsuch? Justice Kavanaugh? I have a couple questions. Justice Gorsuch is hypothetical about the SSI millionaire. I mean, that's unlikely to happen in the real world, but it could happen. But couldn't it also happen that someone on Medicare has, you know, golden insurance, private insurance that's going to cover them and so they never really need Medicare even though they're in the Medicare program? Yes, and I suspect that's somewhat more likely than million dollars. It is more likely. Why? I think it is more likely. Why is that more likely? Well, because everyone is entitled to Medicare when they turn 65, and some who have turned 65 are quite well off and may have amazing insurance. And so I think the million-dollar hypothetical is a hypothetical for a reason. The reality is the individuals who do not get payments in certain months because of excess income are probably not the millionaire or the lottery winner or any of those other hypotheticals you can come up with, but instead are individuals who slightly pop over the income threshold by a small amount in a month only to fall back under it the following month. And that's the reason why there are so few that are terminated from the program because they can't string together 12 months of income stability. So for people who do pop over for a month over the limit, most of them stay in the program because they're back under the limit at some point. Is that correct percentage-wise? That's correct. A large percentage of them, right? Yes, a very significant percentage. Then on Medicare as well, it was going away. I mean, I might have a different understanding. In fact, it's almost certain I have a different understanding of Empire than Justice Kagan does. But I thought Medicare was going away for that day if you had private insurance, but the court nonetheless said you're still entitled to Medicare even though you didn't have any Medicare coverage for that day. That's right, and I think there's a couple different things that come in there, but I think that's where the conditional entitlement comes in. That's a season ticket holder example from the Empire Health briefing. Then last question. This is very tactical, but what happens in the real world may affect how plausible it is that Congress would have chosen one interpretation over another. So if you lose, what's going to happen realistically to rural hospitals and urban hospitals that serve as safety nets? Yes, so here I would point to the amicus brief, which goes through it in some detail. The reason Congress created the adjustment to begin with is because of the higher costs of treating a low-income population, and hospitals that treat a disproportionate share need this money in order to stay afloat for many hospitals. And for others, the point is to try to incentivize them to provide the services that are needed to service this vulnerable and at-risk population. And without a proper reimbursement under the formula, that's going to be very difficult and has been very difficult for hospitals to do. And hospitals will close, or do you think that's not realistic? The amicus brief suggests rural hospitals are going to close. I think that is realistic. I mean, the amicus briefs go in some detail about how close the margins are and how difficult it is, and how significant the DISH adjustment and the particular amount of the DISH adjustment is not only to DISH but to other programs that piggyback off of eligibility for DISH. Okay, thank you. Justice Barrett and Justice Jackson. Yes, Justice Kagan asked you how close is this to Medicare, given the way the DISH statute is constructed. And I guess I'm a little concerned that how close it is or how much it looks like or how much it operates like is really beside the point. So if we set aside Medicare for a second and we just look at this program, and if we assume, as Justice Kagan does, that this is just about the cash payment, I am wondering about the distinction that you're drawing between eligibility for the program, which we can call entitlement, versus eligibility for the payment. As I understood it, eligibility for the program or entitlement gives you the assurance that in any month during the next year when you fall below the income cap, the government will send you a check. So that's what's left. Even in a month where you don't get a check, you know that maybe next month you will if you don't have this extra cash coming in. Am I right about that? That's absolutely right. And for more than a year, you have that assurance for so long as you haven't been able to string together 12 consecutive months of higher income. And you also have the government working for you in that effort, right? So when you apply, you apply to this program and you have to meet the eligibility criteria. I'm looking at the statute, and it gives the criteria of you being aged or blind or disabled. You have a certain income. You have certain resources. And the statute says, shall be an eligible individual for the purposes of this subchapter. Setting aside all the other benefits, and I'm just focusing on the cash benefits, I would think one of the things that comes with that is the government every month is monitoring your finances, and in any month in which you go below the payment, they will send you a check automatically. Is that right? I think that's right in part, and the government can correct me if I'm wrong. I think when you fall below it, you might have to make a phone call and request reinstatement. That's a regulatory requirement. It's not in the statute itself. But you're entitled to do that. Absolutely. An ex-person on the street who's not enrolled in the program can't just ask the government for money. You get to do that because you are an entitled person and you met those original criteria, right? Exactly, and that is the real difference, right? The person on the street, right? This is not a case where every month you're just walking up to a window, filling out a form, and then walking away with a check. Once you're in the program, you're in the program. And you get the benefit of picking up the phone and calling the government and saying, please send me my check, or the government does it automatically in any month in which you are entitled to get it, right? Right, and you authorize the government to have access to your financial records for so long as you're in the program so they can continue to check your income against the guaranteed monthly income. Thank you. Thank you, counsel. Commissioner McDowell? Thank you, Mr. Chief Justice, and may it please the court. The DISH provision is designed to compensate hospitals for serving a disproportionate share of low-income patients, and in the Medicare fraction, Congress seized a patient's entitlement to SSI benefits as a proxy for determining whether the patient is low-income. SSI benefits are monthly cash payments made by SSA when a person meets eligibility requirements in a particular month, including the requirement of having low income in that month. Thus, as HHS has consistently recognized since Congress enacted the Medicare fraction, a person is entitled to SSI benefits only when he satisfies the requirements for a cash payment during the month of his hospital stay. That interpretation is fully consistent with the one this court upheld in Empire Health. The Medicare fraction uses two distinct phrases, entitled to benefits under Medicare Part A and entitled to SSI benefits under Title 16. And while the word entitled means the same thing within both phrases, benefits under Medicare Part A are fundamentally distinct from SSI benefits under Title 16. Petitioners claim that a person is entitled to SSI benefits even if he is not owed a cash payment during the month of his hospital stay, so long as he received at least a single cash payment sometime within the year prior to his hospital stay. But SSI benefits are monthly cash payments, so if a person is not entitled to the cash payment in a particular month, he's simply not entitled to SSI benefits in that month. Petitioners also claim that SSI benefits under Title 16 include not only cash payments, but also certain non-cash benefits. But those non-cash benefits are not supplemental security income benefits because they are not cash payments made by SSA, nor are they provided under Title 16. Ultimately, petitioners would routinely count patients as low income, even though they are earning too much income to be entitled to an SSI benefit. That approach is flatly inconsistent with Congress' choice of SSI entitlement as the proxy for low income status. I welcome the Court's questions. Petitioner argues that the whole purpose of this formula is to determine low income population that is served, which is a good point, and that enrollment in the SSI program is only for people who are low income, even though people may fall in and out of the monthly payment requirement. Why isn't she right? Why isn't Petitioner right? So, Justice Thomas, I think our position— I understand the statutory argument. Yes. So what difference does it make in a practical sense if your reading is accepted or her reading is accepted? Right. So I think ours gets to the purpose of the disprovision better because ours is more precise at capturing low income people in the month of their hospitalization. We're only going to count someone as low income if they've established that they are low income in the month of their hospitalization. But why does that matter? I'm so confused about your argument, I have to say. I'm struggling to understand why an individual's eligibility for payment in a particular month has any bearing on the goals of compensating hospitals for the higher cost of low income people. So let me give you a hypothetical. Imagine a man who's lived well below the poverty line for his entire life. He has a range of health conditions that result from that kind of upbringing. When he turns 65 in January, he applies for SSI payments and starts receiving them in February pursuant to the statute and the regulations. Let's say in June, he comes into a bit of cash. He inherits some jewelry, he sells it, he picks up an extra shift at work, he gets money back from a friend who owes it to him, okay? We can all agree that if the extra cash he gets in June brings him above the threshold, he doesn't get a cash payment that month because now he's above the threshold. But the Medicare fraction, I thought, was not about how much cash a patient had in any particular month. It's about how costly it would be to treat this person. And I don't understand why it is less or more costly in June when he has the heart attack than in May when he doesn't get the cash payment. So, Your Honor, I think that understanding of the statute rests on an erroneous premise in Petitioner's argument, which is their misreading of subsection A, which is entitled eligible individual under 1382. They think that means you look back to the person's income over the last calendar year in the application to see has this person been poor for the last calendar year. If that were how the statute worked, I would agree with you. But why isn't that the part of the statute that DISH is referring to? I mean, it's clear that that part of the statute says this person, the person for the year, shall be eligible under SSI. That's in the statute. So what I'm asking is doesn't it make more sense that the DISH program, which is trying to capture people who are low income in this general sense, because they will have more serious and more difficult to treat, costly to treat health issues, why isn't it referring to A? And what I'm saying is they are misreading A. That is not how it works. Okay, so let me just, I thought the choice was between A and B. You say the DISH program is referencing B, which is, or sorry, C, excuse me, which is the provision that says you get a payment in a particular month. And my question to you is why would Congress care about whether you're getting a payment in a particular month as the marker of whether you are low income and it's more costly? Because that is the entirety of the SSI statute. A does not work the way that Your Honor is positing. A is establishing the income limit for SSI eligibility. It's phrased in terms of a calendar rate, but it is set monthly according to subsection C-1. And just to give you, just to explain why textually that has to be right, section 1382-B is about- I'm not asking you a textual argument. I'm just asking you a purpose. Your argument seems to result in people who get cash payments, who have the exact same income level as someone who didn't get a cash payment, one is counted and one is not. And what I'm asking you is why would Congress have set up the DISH program to make that distinction? Because Congress picked up the SSI entitlement proxy as an off-the-rack proxy. It was a preexisting metric. It existed since 1972. Congress was acting in 1986. It just picked up this indirect proxy measure. It doesn't have to be perfect 100% of the time. Theirs is not perfect 100% of the time either, as Justice Gorsuch's hypothetical shows. And my point is that ours is more precise at capturing low-income people because we are looking to whether they establish low-income status. So let's talk to that, okay, whether it is more precise. Let me give you the hypotheticals. Someone's eligible, joins SSI in January, is hospitalized in January, but they've received no cash payment in January. They're going to get it on February 1st because they just joined the program. Are you including those people? So if they just joined under the statute, those people would not be entitled to benefits in the first month. Even though they are eligible because they didn't make more money, they should be. It's only they happened to join the program the month they got sick. Your Honor, they're not eligible. That's an eligibility criteria. It says you're not eligible for payment until the second month after your application. So it's not capturing people with low income even. So you made a statement. We now have a group of people that are not captured at all. Then you have the second hypothetical, which is that her income was high in January. So on February 1st, her income has gone back down, but she's not going to get a payment because in January, her income was high. That's not correct, Your Honor. That is based on a misreading of C-1 and C-2 of Section 1382. So Section C-2 would apply in the situation where someone is transitioning from ineligibility in a month to eligibility in the month. And what C-2 says is that in your first month back into eligibility, you look at your income in that month to determine whether the person is entitled to benefits. But she still didn't get a check. She would get a check is what I'm saying. When is she going to see it? She's not going to see it on February 1st. She would get the check for purposes of February, and our rule does not turn on whether she actually receives the payment. Our rule is not an actual receipt rule. We've explained that extensively in the 2010 regulation. We do not apply an actual receipt test. We looked at whether someone satisfies the statutory requirements for a cash payment during the relevant month in question. Whether they actually receive a check is irrelevant. I'm confused about that, actually, because I was asking your friend on the other side these questions about, well, if there was some snafu because it bounced because of an address or something like that, whether they were challenging those codes, and she said no. But why isn't that an actual receipt rule if those people are excluded? So the way that works is if they provide an address later in a subsequent month, we will go back and retroactively reinstate benefits for the prior month, and then that retroactive reinstatement will be counted for purposes of the numerator. So those people will be reflected in the numerator, because once they provide the address, we will go back and- Retroactively, so then the hospital gets the benefit of the different dish fraction later? Exactly, because our data set goes 15 months beyond the end of the fiscal year, precisely so that we can capture those retroactive benefits reinstatements once suspensions are lifted for administrative reasons. That's, again, in the 2010 rule. We discussed it towards the end of our brief. Can I ask about the similarities and differences with the Medicare? So as you're exploring these answers, you can bounce in and out of actually receiving SSI payments. You're in the program, they say, for a year, but you might not receive payments in a particular month, right, so far? Medicare, the argument on the other side, is similar in the sense that you're in the program, you've qualified for Medicare, but you might have private insurance, lots of people do, and therefore any particular hospital stay in a given day, week, month might be paid for by your private insurance, not by Medicare. So even though you're not getting Medicare payments, Medicare is paying zero, that, we said, in our empire is still going to be counted because you're in the program. So what's the difference between those two things? The difference goes to the structure of the statute. So with Medicare Part A, there's a threshold eligibility determination, which is whether you're over 65 or have received disability benefits for 25 months. Once you get through that threshold step, you're into the program and you are entitled to a broad array of benefits. It's not just the inpatient hospital care coverage, it's post-hospital care, hospice care, home health care. But how is that relevant to the question here, which is, I thought, looking at payments? Right. So that gets to the second layer of determinations under Medicare Part A. Each of those benefits has different payment limitations. So that's what was at issue in Empire Health, essentially. Here, there's only one determination. It's all about month-to-month payment determination. There's no threshold program eligibility determination because that's not what Subsection A does. Subsection A just establishes an income limit for SSI eligibility that is applied on a month-to-month basis under C-1. Subsection A is not its own threshold. I don't mean to press too hard, but it seems to me you're suggesting that there are multiple reasons Medicare might not pay, maybe. And there's only one reason that SSI might not pay? Is that what you're suggesting? What I'm trying to say is that their argument is that this is different because they're the same because they're both programs. Our point is that this is not a program. They're both programs in which you could be receiving payment in a relevant period, but not for the precise period that you're in the hospital. Right. And the difference is the structure of the benefits statutes. So SSI is all about month-to-month payment. There is no threshold. Am I right that you can't be terminated from the program until, for a period of 12 consecutive months, your income is not exceeded, or maybe 11? That's not how, actually, it works, at least in practice. So the way that that works is we terminate someone's name from the administrative database, but we don't consider them part of a broader program in the same sense as Medicare Part A. When do you terminate them from the database? After 12 months of ineligibility, and I actually think that's extremely important. But they're in the database. So let's say you drop out. Sorry to prolong it, but it's important to me, at least. You drop out for a month. The next month, because your income has gone above the limit. The next month, your income is below the limit. Do you have to do anything to receive the benefits in that next month? You don't need to do anything. Well, you would have had to tell them when you go from eligibility to ineligibility. You're supposed to report changes in your status so that they know. That's not the question. The question is in the next month, when your income goes below the limit, do you have to do anything to receive the benefits in the next month? I think your answer was no. So if you're transitioning from eligibility to ineligibility or vice versa, you do have to report those changes to SSA. What I was going to say – But you don't have to reapply, right? I think that's Justice Kavanaugh's question. Well, I'm not done. I'm not done. Okay, my point about the application is that the application is actually just a monthly application. In the application, they are just looking at your income in that month. It's essentially the same thing as the later determinations. It's just in a form as opposed to done more seamlessly. But the actual substantive criteria, if you look at the application, they are asking, are you low income in the month of your application and in subsequent months while your application might be pending? There's no question on the application that goes back and says, have you been low income for the last year? If I could understand this, because these are really important questions. What you're saying is that in Medicare, we were looking at a program where even if you had reached the cap for hospital care, there were many other kinds of medical care that one could access the insurance program for. You could access it for home health. You could access it for outpatient treatment. You could keep getting stuff from Medicare even though you could reach the cap on hospital care. Is that correct? That's exactly right. And we all know that health insurance works that way because we reach the cap on one thing and we keep on benefiting from our insurance on another thing, right? That's just the way health insurance works. But you're saying that here, there's only this cash stream. There's only the monthly payments that one is getting. That's right. Then the question is, okay, well, what about these references to the annual? What about these annual measures? Aren't you sort of in the program for a year, even though you're not getting payment for particular months, right? Yes. And there are those references in the statute. What are they there for? So they are in Section 1383, which is captioned procedures for payments. They are administrative housekeeping provisions. One says you are in SSA's administrative database for a year until you've been ineligible for 12 straight months. That provision was added 14 years after the statute was enacted. It was added in 1986. And it was simply meant to codify SSA's existing administrative practice of removing people from the database. It wasn't meant to change the fundamental scope of the entitlement under Section 1383. And the fact that you don't have to apply, I mean, this is a very reapply for 12 months' time. This is a pretty sensible provision from everybody's perspective, right? Because Congress knew that people were going to come in and out. Some months they were going to be above the threshold. Some months they were going to be below the threshold. So some months they were going to get monthly benefits, and some months they weren't. But to have everybody reapplying every month as that happened didn't make sense for anybody. It didn't make sense for the people who were giving the benefits, and it didn't make sense for the people who were receiving the benefits. That's exactly right. And just to focus on Section J1 of 1383, I think this is an important textual point. It refers to those 12 months as months of ineligibility. So under a petitioner's view, a person is both eligible for the program, eligible for benefits, and ineligible for benefits in the same month, and I think that's not a coherent reading of this statute. May I pursue that just a little bit? You mentioned 1383, and one of the provisions in 1383, Mr. McDowell, concerns the ability of SSA to secure financial records, and it says that it continues until the cessation of the recipient's eligibility of benefits. Doesn't that suggest that eligibility for benefits doesn't fluctuate from month to month? Because otherwise SSA, I suppose, wouldn't be able to access a recipient's records for the months in which his income goes above the threshold. So that is the only term. I know. That's why I'm picking the hardest one for you. What SSA has said is that we're going to read this in a beneficiary-friendly way. We're going to say beneficiaries only have to reauthorize or authorize at the outset because if they had to reauthorize every single month, they would lose benefits if they forgot to reauthorize in a particular month. It's an application essentially of utility error, which says that the canon of consistent usage will yield where the result would be unworkable. That's what SSA has said as to this particular provision, but everywhere else in the statute it reads eligibility to be month-to-month payment eligibility. But here it doesn't mean that. It means the 12 months. Only because the result would be unworkable and bad for everybody, including beneficiaries, so it has taken that one isolated interpretation. Just two more quick questions. One, the D.C. Circuit in places seems to adopt an actual receipt rule, which you have disavowed. Would an affirm, in your view, be the appropriate? That's what your briefs ask us to do is affirm. Is that the appropriate remedy given some of the language in the D.C. Circuit opinion talking about actual receipt? Your Honor, in the relevant portion of the opinion analyzing the question presented here, the D.C. Circuit says HHS reads the provision to cover only Medicare beneficiaries who are entitled to SSI cash payments at the time of their hospitalization. That's at Pet Act 9. That's exactly our position. Judge Katz has absolutely understood our position, went through the arguments, and adopted the correct reading. He did not think that we were applying an actual receipt.  And then if you could address the concern that some of the amici have raised about what this would mean to rural and urban hospitals. So we understand that DISH payments are critical to hospitals, and we provide billions of dollars in DISH payments each year. In 2024, it was approximately $9.2 billion for hospitals under this program, under DISH. And what the court said, though, in Empire Health, is that the point of the DISH provision is not to provide the most money possible to hospitals. It's to compensate hospitals for serving a disproportionate share of low-income patients. And we don't think that the statute authorized us to provide any more DISH payments. We think that the statutory text unambiguously prevents us from putting out more DISH payments under this provision. Can you help me to understand why you think that there aren't threshold eligibility criteria in this statute? Yes. You pointed to 1383, but what about 1381A and 1382A, both of which seem to be pointing to age, blindness, and disability as threshold criteria in addition to income? And if that's the case, I'm wondering why those aren't the kinds of things that the government assesses at the outcome to determine your eligibility for the program, and then they may do the monthly assessment of income pursuant to the rest of the statute. We assess those things at the outset, but we also reassess them every month. It just so happens that someone can't age backwards, so of course we don't go back and do it. Every monthly application, when you call up and you say, please give me the check, I've fallen out one month, do they reassess your disability status? The statute gives SSA discretion to determine when to make these re-evaluations. No, no, no. I'm not asking discretion. I'm asking, what does the government do? Because it seems to me that if the government does not reassess the threshold criteria of disability, then you're in the program based on the government's initial disability determination, correct? I disagree, Your Honor, because we don't reassess disability every single month. We do do periodic reassessments, but still the entitlement is a month-to-month entitlement because the entitlement is not based solely on... No, I understand. The payment is made on a month-to-month basis, but you make the payment only to the category of people who also meet age and disability criteria that you assess only at the beginning. So what I'm asking you is, isn't that initial assessment the same kind of thing as the threshold determination that happens in most benefit programs, and then you're in the program, and then the monthly assessment occurs to give you the benefit or not? No, Your Honor, because with respect to Medicare Part A, you get into the program by being 65. Then you're in, and you get access to all of the benefits from the threshold. Here, just because you're disabled in the first month does not mean that you are into a program. You still have to show every single month that your income is below the income limit. And just to point to Section 1381A, that text refers to a determination of eligibility on the basis of income and resources. Yes, and then 1382A is set up to look at the income and resources, and then it says, shall be an eligible individual. It seems to me very clear that the statute is set up to make a threshold determination of who is eligible on the basis of income and resources, given those provisions that I just outlined. Your Honor, I disagree, and just to point you to 1382B1, that also refers to the benefit amount in terms of an annual rate. Yes, but that's in procedure. That's all we've already determined. 1382B1. I see. Yes, so that's at 5A of the statutory appendix to our brief. That is talking about a rate of the amount of benefits for the calendar year, and everyone agrees that SSA does not have to pay benefits annually. It has always been converted into a monthly amount, and petitioners on page 7 of their opening brief concede that that has to be done, because subsection C1 requires a monthly payment eligibility determination. C1 is the determination. It's the only determination in the statute. That's the determination that is referenced in 1381A when it talks about determined eligibility on the basis of resources. It points you to C1, and if you look at C1, which is at 6A of the appendix to our brief, it says an individual's eligibility for a benefit. I'm sorry, how can you get to C? 1382A. 1382A says, right, you make a determination of their eligibility on the basis of income and resources. And when you get to 1382A, which is the next provision, it says an eligible individual defined, and it is set up to make the determination on the basis of income and resources. Your Honor, that income metric is converted into a month-to-month limit. No, I understand. I understand. I'm just saying, but isn't 1382A relevant to determination of who is an eligible individual? It is relevant to the income criterion, yes. That is relevant. What I'm saying is it's converted into a monthly limit because this whole statute is inherently month-to-month. It's designed as a month-to-month statute. On the question of insurance, I think in your briefs, a lot of your argument, maybe not a lot, but some turned on, this is not insurance. And you heard what your friend on the other side said in response to that, that that really functions just like insurance. Yeah, I would make a few points about that. The first is as a textual matter, Congress expressly referred to Medicare Part A as insurance. It did that in 42 U.S.C. 426 and 42 U.S.C. 1395C. It never called SSI insurance. And I don't think SSI functions like an insurance program in two particular ways. First, insurance, as the Court explained in Empire Health, it's very natural to talk about the entitlement to insurance as being separate and apart from the right to payment because you are still entitled to insurance even if your policy doesn't pay for a particular medical service. Here, everything turns on the right to payment. And then the second difference is that with SSI, it doesn't insure you against future risks. You can't successfully apply for SSI until you are already low income. Whereas with Medicare Part A, you get in automatically when you're 65, and then it protects you, insures you against any future health care expenses thereafter. What about the disability in Medicare? The disability in Medicare is a little bit different, but the Court in that case relied on the fact that... If you're under 65 and disabled, you apply, right? That's right. But the Court in Empire Health specifically said that the entitlement to Medicare Part A is automatic. And the reason why it said that is because the vast majority of Medicare beneficiaries are getting it because they're over 65. I think that Ms. Sherry's idea for how this is insurance, and she'll correct me if I'm wrong, but the idea is that even if you run over the threshold in a particular month, that you know that you're going to get the benefit in the next month when you go under the threshold, even without a reapplication. So the insurance, which she said really isn't really insurance, it's sort of assurance, is that I have an assurance for a period of a year that I won't have to reapply when I go under the threshold again. So what should we make of that? So I agree that you don't have to submit a new application, but you will be subject to another determination. You'll have to tell them when you become ineligible. Then you'll have to tell them when you think you're going to be eligible again, and they're going to take another look at it. You don't have to submit a paper application again, but there is another determination. In Medicare Part A, there's just a threshold eligibility determination, and then you're in the program and you get access to this wide array of benefits. So it's quite different. On the consequences that Ms. Sherry talked about for the hospitals, are you saying those are, as a factual matter, you disagree with the predictive judgment in the amicus brief and in the petitioners, or are you saying, yeah, hospitals could close, but that's the nature of a program and the limited resources? Well, Justice Kavanaugh, it's not as if this has been the longstanding position. This has been the position since 1986, so it's not as if how the court decides this case is going to necessarily change the status quo. If it agrees with us, it just will be maintaining the status quo. And then as to some of the arguments in the amicus briefs, they point to the 340B drug pricing program as kind of another potential harm here, but they don't fully explain the fact that hospitals do have other pathways of getting into that program. I think there are three things. You might not qualify for DISH at all because of the cutoff to 15%. If you do qualify, the benefits might be less, and you might not qualify for 340B. There's three buckets of things. So I don't disagree as a factual matter that if you don't qualify for the 15% that you're not part of the DISH payment program, but I will say that one thing that is important is that the ACA has already changed the status quo here because it's diminished the importance of this Medicare fraction formula already because now for a hospital's DISH payment, 25% is based on this formula, where previously it was 100%, and now it's 25%, and 75% is based on the rate of uncompensated care, which is a totally different metric. I think your answer then is their predictive judgment's wrong because this is the way it's been said. That's essentially correct, and I will say that they put out a $1.5 billion number in their cert petition on page 18. They don't explain how they get to that number. Well, they say you're not giving them the data to figure it out, so that's a little red from their perspective. The D.C. Circuit already considered that argument and rejected it, and it's not before the court, and I am happy to speak to that data issue. That's okay. That's probably too in the weeds for you. Thank you, Counsel. Justice Thomas? Justice Gorsuch, any further questions? Justice Jackson? Thank you, Counsel. Rebuttal, Ms. Sherry? Thank you, Your Honor. So starting with the program eligibility issue, Justice Jackson, we agree with your reading of the statute, both in terms of 1381A and 1382 subsection A. It talks about in a calendar year, these are eligibility requirements. Disability is not reassessed on a monthly basis. In fact, one of the provisions we point to on page 26 of our brief is one that shows that redetermination can occur annually, every few years, what have you. And so there is this broader concept per statute of program eligibility. What they really are saying is, yeah, okay, but that's not what we do in practice. You know, in practice, we look at it on a month-to-month basis, and we ask for only a month of financial information. I actually think the application asked for about 14 months, and I think per statute it would be very strange to approve an application for someone who says, I have no money in this month because I spent all my money and I'm unemployed, but I just got a new job, and starting next month I'm going to make a million dollars a year. I don't think that person would be SSI eligible under the terms of the statute. And you can look beyond that. If you look at the charts that we pointed to that are in the Joint Appendix from the Court of Appeals, what it's measuring is duration of eligibility, meaning from the very beginning when the application is approved to when you're kicked out of the program. That's what determination numbers are. And so this isn't a concept that we've made up. It's in the statute. It's in their regulations. It's in the statistics that they keep. The second point has to do with insurance. The question here isn't really whether it's called insurance. It's whether it functions like an insurance program in the relevant respect. And it does, and Justice Kagan, you're right. It's a form of insurance. It's a safety net. It functions in the same way. And the fact that it doesn't take account, I mean, it's not health insurance, but there's things like unemployment insurance that function in a similar way. It's called insurance. It's different than Medicare. But what matters for dish purposes is not whether it's quote, unquote, insurance, but whether or not there is something bigger than just the individual monthly check to people on the street, and there is. To that point, it is more than just cash. There are non-cash benefits. And so it's similar to Medicare Part A in that respect, too, where if someone is not entitled to cash payment in a given month, and these are individuals who are disabled, which is about 85% of the SSI population, they're entitled to Medicaid continuation. They're entitled to vocational rehabilitation, both in Title 16. And just to point the court, because I think there's some confusion when it comes to in the briefing, this didn't come about until 1999, but if you look at that particular statute and you look specifically at subsection C1 and J1B, it just takes you right back in to Title 16 and right back in to 1382D. Fourth point has to do with this time lag issue. I think there is confusion in the brief, and frankly, confusion that we have about how they account for these individuals, whether they're paid in the current month, what that's based on, and whether or not they're counted. I agree with the reading of the statute. If you look at C2 and you look actually at the regulations 416.420, it does seem like those individuals should be getting a check, and it seems like they should be counted. It's just not clear whether they are. And we get that from the program's operation manual. If you look at 2005.001, it seems to say we do this measurement based on months prior, and you may not be payment eligible in a month because of what you made in a prior month. So it's not clear what's happening on the ground, and I think that goes to the point of our $1.5 billion figure. Notably, they haven't come up with a figure of their own. They're the ones that have this information. They have no counter number, and we are in a position where we can't look behind the curtain. We don't have access to the data. That's our best estimation of what the delta is, and they don't come up with a contrary number to that, which I think just gets us back to DISH and to the purposes of DISH. They say what you should be counting are individuals who are low income in the hospital month, but they don't address the fact that their interpretation simply does not count those individuals. They don't count the nursing home patient. They don't count the first month, as the answer to the question revealed. They don't count those in prison. They don't count those who violate a parole or probation, and they don't count those in administrative suspension. I think the actual receipt test and where there's confusion is maybe just one of semantics. It's true that if those individuals are no longer suspended when they run the 15-month eligibility file, then they'll count them. But if they still are, then they don't count them. And so there's individuals where they need to have a representative payee accept their check. They're eligible. They're absolutely due. They don't have someone who can accept the check. Those people are not counted, and that's what matters for DISH purposes. Thank you, counsel. The case is submitted.